UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CIVIL ACTION NO. 6:20-cv-00019-DCR-EBA

JIMMY MALONE                                                                                             PLAINTIFF,

v.                         **MAGISTRATE JUDGE'S REPORT
                            AND RECOMMENDATION**

UNITED STATES OF AMERICA,                                                                       DEFENDANT.

\* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter is before the Court on Defendant United States of America's motion for judgment on the pleadings, or in the alternative, motion for summary judgment. [R. 37]. Defendant's motion is in response to Plaintiff Jimmy Malone's complaint, seeking compensation under the Federal Tort Claims Act for injuries he alleges occurred at USP McCreary. [R. 1]. Plaintiff Malone did not respond to the United States' dispositive motion. Having reviewed the Defendant's brief and supplemental filings, for the reasons outlined herein, the Court recommends that the Defendant's motion be granted.

II. Factual and Procedural History

*Pro se* Plaintiff Jimmy Malone is a federal inmate serving a 192-month sentence. He is currently housed at the United States Pentitentiary in Tucson, Arizona, but was previously in the United States Penitentiary in Pine Knot, Kentucky—known as USP McCreary. [R. 37-1 at p. 1]. Malone was housed in USP McCreary from July to October of 2017. [*Id*. at p. 2]. When he first arrived at USP McCreary, Malone was interviewed by staff pursuant to 28 C.F.R. § 522.21(1),

which requires prison staff to determine if there are any non-medical reasons for housing the inmate away from the general population. In doing so, staff must "evaluate both the general physical appearance and emotional condition of the inmate." 28 C.F.R. § 522.21(1). At that time, Malone informed staff that he had previously cooperated with law enforcement and testified against someone. [*Id.* at p. 4]. Malone also indicated that he was a Central Inmate Monitoring Systems (CIMS) Case, a special designation used to identify inmates who require "a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities" 28 C.F.R. § 524.70. The CIMS designation includes, among other categories, witness security cases. *See* 28 C.F.R. § 524.71. Malone claims in his complaint that he informed staff of his prior law enforcement cooperation and expressed fear for his safety—asking to be placed in administrative segregation. [R. 37-4 at p. 54]. However, Malone's Bureau of Prisons Intake Screening Form shows that he answered "no" to the question, "Do you know any reason that you should not be placed in General Population?" [R. 37-3 at p. 8]. Malone was subsequently placed in a general population housing unit. [R. 37-1 at p. 4].

Malone testified during his deposition that he asked the Unit Manager of his housing unit two separate times to be placed in protective custody. [*See* R. 37-4 at pp. 68-69]. He further testified that he separately asked his case manager and a unit officer to be transferred to protective custody. [*Id*. at p. 75-76]. Malone claims that those requests were either ignored or denied because staff no longer saw his situation as a legitimate threat. [*Id*. at p. 69]. He further asserts that while in general population, he was warned on two separate occasions by other inmates that he was in danger. [*Id*. at pp. 88-89]. Following the first warning, Malone made no

attempt to seek protective custody or notify staff that he might be in danger. [*Id.* at p. 98]. After the second warning, Malone passed a note to a unit officer seeking removal to protective custody. [*Id*. at p. 104]. Malone was subsequently summoned to the on-duty lieutenant's office, where he claims he again reiterated his concerns and asked to be removed from general population. [*Id*. at p. 106]. Malone claimed in his deposition that the Lieutenant laughed at him and told him to go back to the housing unit. [*Id*.]. Later that evening, Malone was assaulted. [*Id*.].

On September 9, 2017, at around 9:10 p.m., prison staff received a duress call from a cell in Malone's housing unit. [R. 37-3 at p. 3]. Upon entering, staff members saw Malone and two other inmates in the cell. [*Id*.]. Malone was actively bleeding and had injuries consistent with a fight. [*Id*.]. Staff ordered all three inmates to lay on the ground. [*Id*.]. Malone was taken away to be treated for his injuries and the other two inmates were taken to the Special Housing Unit. [*Id*.]. Medical staff evaluated Malone and found, among other injuries, a deformity and some lacerations on the back of his head. [R. 37-2 at p. 2]. Prison medical staff prepared him to be transported to a local hospital. [*Id*.]. Upon arrival, local EMS made the decision to transport Malone to the University of Kentucky Medical Center (UKMC). [*Id*.]. He was evaluated at UKMC, undergoing a panel of imaging that indicated no fractures or abnormalities. [*Id*.]. His head wound was stapled shut and he was discharged back to USP McCreary. [*Id*.].

Subsequently, on May 7, 2019, Malone filed a Claim for Damage, Injury, or Death (Form SF95) with the Bureau of Prisons. [*Id*. at p. 3]. Therein, Malone claimed he had been assaulted by two other inmates with weapons and suffered a traumatic brain injury, puncture wounds, blood loss, and pain. [*Id*.]. He further claimed that he warned prison staff that he had previously cooperated with law enforcement, putting him in danger of attack. [*Id*.]. Malone sought $250,000

for physical and emotional pain and suffering. [*Id*.]. On October 29, 2019, the Bureau of Prisons informed Malone that his administrative claim had been investigated and denied. [R. 1-1 at p. 2]. The Bureau of Prisons indicated that there was no evidence prison staff were aware of a specific threat to Malone or a risk to his safety. [*Id*.].

On January 28, 2020, Malone initiated this action, seeking compensation under the Federal Torts Claim Act (FTCA).[1] [R. 1]. In his complaint, Malone alleges that, because of his prior cooperation with law enforcement, he was labeled a "protection case" by the Bureau of Prisons. [*Id*. at 3]. He further alleges that he told staff he was concerned about his safety, and that doing so should have triggered performance of a threat assessment pursuant to Bureau of Prisons regulations. [*Id*.]. Malone further claims that USP McCreary staff failed to perform a threat assessment, and ultimately placed him in general population. [*Id*.]. He asserts in his complaint that in general population he received death threats and asked for protection, but still no threat assessment was performed. [*Id*.]. Malone claims that the staff was "on specific notice that [he] had received death threats, from specific inmates" and took no action. [*Id.* at p. 7]. As a result of prison staff's inaction, Malone alleges that he was attacked by other inmates, necessitating emergency medical treatment. [*Id*.]. Malone claims that he still suffers from emotional issues as a result of the attack. [*Id*.]. He seeks $250,000. [*Id*. at p. 7].

Following a period of discovery, on April 16, 2021, the United States filed the instant motion. [R. 37]. Malone failed to file a response to the United States' motion for judgment on the pleadings or, in the alternative, motion for summary judgment.

---

[1] In his complaint form, Malone checked boxes indicating that he was bringing claims as both a *Bivens* action pursuant to 28 U.S.C § 1331 and under the Federal Tort Claims Act (FTCA). [R. 1 at p. 1]. However, his complaint contains a sole claim, seeking judicial review only of his FTCA denial. During his deposition, Malone further

III. <u>Standard of Review</u>

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is reviewed under the same standard applied to motions to dismiss under Rule 12(b)(6). See *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). In evaluating a motion for judgment on the pleadings, a court "construes the complaint in a light most favorable to the plaintiff, accepts all factual allegations as true, and determines whether the complaint states a plausible claim for relief." *Id*. at 611. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d).

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a motion then "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). This is so because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. To avoid summary judgment, the non-movant must come forward with evidence on which a

---

indicated the his FTCA claim was his only claim. [*See* R. 37-4 at p. 142]. Thus, the Court will only analyze Malone's FTCA claim.

jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The following factors bear consideration by a court when entertaining a motion for summary judgment:

> 1. Complex cases are not necessarily inappropriate for summary judgment.
>
> 2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
>
> 4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> 5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.
>
> 6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion.
>
> 7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.
>
> 8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> 9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> 10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent,

the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.253, 288 (1968)). In such a case, summary judgment is warranted. *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010); *Celotex,* 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

## IV. Analysis

The United States' dispositive motion is now ripe for a decision. The United States moves first for relief pursuant to Federal Rule of Civil Procedure 12(c). [R. 37]. However, Rule

12(d) provides that if a party moved under Rule 12(c) and there are matters presented outside the pleadings, then "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Accordingly, because the United States relies on the content in the exhibits it provided, the Court converts this motion into a motion for summary judgment, the alternative relief requested by the United States. See *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999).

In its motion, the United States seeks summary judgment, claiming that it enjoys sovereign immunity in the case at bar. [*See* R. 37-1]. Indeed, federal courts generally lack jurisdiction to hear lawsuits brought against the federal government, absent the United States express waiver of sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Under the Federal Tort Claims Act the United States has, under some circumstances, waived its sovereign immunity and conferred subject matter jurisdiction on the federal district courts to hear tort actions against the federal government for the negligence of its employees. In relevant part, the FTCA authorizes suits against the government to recover damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Through a limited waiver of sovereign immunity, the FTCA provides the exclusive remedy for tort actions against the federal government, its agencies, and employees. *Ascot Dinner Theatre, Ltd. v. Small Business Admin.*, 887 F.2d 1025, 1028 (10th Cir. 1989).

The United States Supreme Court has held that the FTCA is applicable to claims made by federal inmates alleging personal injuries they received while incarcerated because of a negligent

government employee. *United States v. Muniz*, 374 U.S. 150 (1963). The duty of care owed to federal prisoners by the Bureau of Prisons is statutorily prescribed, stating in part: "The Bureau of Prisons, under the direction of the Attorney General, shall . . . (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise." 18 U.S.C. § 4042(a)(2).

The FTCA is but a limited waiver of sovereign immunity, such that the United States can only be sued to the extent which it has waived its immunity. *United States v. Orleans*, 425 U.S. 807, 814 (1976). The United States reserves immunity in specific instances, provided in 28 U.S.C. § 2680. § 2680(a) specifically carves out a discretionary function exception (DFE), reading:

> The provision of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). If a case falls within the statutory exceptions of 28 U.S.C. § 2680, the court lacks subject matter jurisdiction. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir. 1984).

The DFE applies when two conditions are met. "The first condition a court must find is that the action involved was a matter of choice for the employee. '[C]onduct cannot be discretionary unless it involves an element of judgment or choice.'" *Rich v. United States*, 119 F.3d 447, 450 (6th Cir. 1997) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). The exception does not apply where "there is a federal statute, regulation, or policy specifically prescribing a course of conduct or action for the employee. If there is no such prescription, the

Page **9** of **15**

employee must exercise judgment and some protection should be provided for this exercise." *Rich*, 119 F.3d at 450.

If the challenged conduct of the government meets the first condition, a second condition must still be met for the exception to apply. "[A] court must determine whether the judgment is of the kind that the discretionary function was designed to shield." *Berkovitz*, 486 U.S. at 536. In enacting the DFE, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). "In sum, the discretionary function insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537.

It is clear that, in the instant case, the discretionary function exception should apply. The statutory authority governing the Bureau of Prisons' duty in incarcerating and caring for prisoners is devoid of any specific course of action the government must take to protect an inmate. The statute, in relevant part, reads:

The Bureau of Prisons, under the direction of the Attorney General, shall—

(1) have charge of the management and regulation of federal penal and correctional institutions;

(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

18 U.S.C. § 4042. ". . . the duty imposed by § 4042(a) is of a general nature, broadly requiring

that the BOP 'provide for the safekeeping' and 'provide for the protection' of federal inmates. BOP officials are given no guidance, and thus have discretion, in deciding how to accomplish these objectives." *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 396 (6th Cir. 2004). Moreover, it is clear that since government policy permits this exercise of discretion, it was designed to shield BOP staff judgements concerning prisoner safety. *Id*. at 397.

In addition to § 4042, the United States cites two additional regulations that govern the actions of prison officials. One states that an inmate *may* be placed in administrative detention (segregated from the general population) in instances where staff become aware that the inmate's presence in general population poses a threat to life, property, self, staff, other inmates, the public, or general security, *or* upon request of the inmate or if staff determines it is needed for the inmate's protection. *See* 28 C.F.R. § 541.23. [emphasis added]. The other provides that staff *may* consider as a protection case, an inmate who is an informant or who refuses to enter general population for unidentified or no expressed reason. *See* C.F.R. § 541.17. [emphasis added]. The use of the word "may" in these regulations is demonstrative that their implementation is discretionary. See *Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999) ("The use of the term 'may' in a statute is generally construed as permissive rather than as mandatory."). Like § 4042, these regulations contain no mandatory language, thus they do not impose a mandatory, nondiscretionary duty on BOP officials. See *Montez*, 359 F.3d at 397. Simply put, in the case at bar, the relevant statutes and regulations allowed prison staff to exercise their judgement when making decisions about Malone's safety.

The Discretionary Function Exception is not without its own exception, however. The DFE may not apply where prison officials are aware of a specific and immediate threat to an

inmate's safety. *Id*. at 398. When the official has knowledge of a specific and immediate threat, "there is a high likelihood that the actions are not based in policy." *Ceballos v. United States*, No. 7:11-21-ART, 2011 WL 5855290, at *3 (E.D.Ky. Nov. 22, 2011). The Sixth Circuit outlined three examples to demonstrate the nuances involved in determining whether prison officials knew of a "specific and immediate" threat—a yes, a no, and a close call. *Montez*, 359 F.3d at 398-99. A specific and immediate threat exists [w]here a prison guard stood by while an inmate was chased and severely beaten by 12 other inmates." *Id*. at 398 (citing *United States v. Muniz*, 374 U.S. 150, 152 (1963)). However, a specific and immediate threat does not exist simply because officials placed the inmate in a location that was inherently inadequate to protect him from assault. *Id*. at 398-99. A close call exists when a plaintiff alleged that prison officials were negligent by not informing him that his youthful appearance placed him at a higher risk of sexual assault, and the plaintiff informed guards that another inmate had been staring at him. *Id*. at 397-98 (citing *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998)).

In this case, the facts and testimony amount to what the *Montez* Court referred to as a "close call." Malone *did* articulate to prison officials a specific threat. The facts of the case at bar are similar to another case from this district, *Parker v. United States*, No. 11-176-ART, 2012 WL 2414887 (E. D. Ky. June 26, 2012). In *Parker*, a *pro se* prisoner brought an action under the FTCA following an assault in USP Big Sandy. *Id* at *1. The Plaintiff, a former police officer, alleged, in relevant part, that prison officials knew that his safety was at risk because of his former profession, but returned him to general population anyway. *Id*. In *Parker,* the district judge found that the Plaintiff did allege a specific threat by asserting that prison officials knew his former profession had been revealed. *Id*. at *4. Missing from *Parker*, was the "immediacy"

element. Parker's status as former law enforcement being revealed "would have placed Parker at significantly higher risk of assault, but the knowledge that an inmate is at a high risk for assault is different from the knowledge that an assault is imminent." *Id*. at *5. "If Big Sandy officials knew that Parker's former profession had been revealed, *and* had reason to believe that this put him at immediate risk of harm, then he may be able to take his case out of the discretionary-function exception." *Id*.

The immediacy element helps to (1) sort out decisions that were not grounded in policy, and (2) defers to prison officials on decisions involving prison safety, keeping courts from second guessing those decisions. See *Dykstra*, 140 F.3d at 796. "The threat of an unspecified future attack, even if from a specific inmate, is not enough to overcome the discretionary-function exception." *Parker*, No. 11-176-ART, 2012 WL 2414887 at *5.

Similar to *Parker*, Malone alleges a specific threat. The United States claims in its motion that all of Malone's assertions of threats against him to prison staff were general in nature. [R. 37-1 at p. 14]. However, the government does not dispute that Malone expressed many times to staff that he was concerned about his safety due to his cooperation with law enforcement. At risk to himself, Malone attempted to seek help from the Special Investigative Services (SIS) staff, his unit team, and executive staff. [*Id*. at 14]. While those individuals' mere knowledge that Malone had previously cooperated with law enforcement *may* not rise to the level of a specific threat, Malone's conversation with the on-duty lieutenant on the day of his assault certainly does.

In his deposition, Malone testified that he was warned by two separate inmates that he was in danger—one a week prior to his assault, and the other on the day of. Malone did not make a request to be moved out of general population following the first warning. As to the second

warning Malone testified:

> "It's a different inmate. He's been there for a long time. And he told me they think you're a snitch, they're going to get you. They're going to get you tonight. You need to be out of here by tonight. And that's whenever I give the note to the CO. And I was called to the lieutenant's office."

[R. 37-4 at p. 104]. Malone was called to the Lieutenant's office where he once again sought protection. Malone recounted the conversation with the Lieutenant in his testimony:

> "He asked what the problem was and I told him I said I testified in two murder trials against these frigging gang members, white gang members against the Aryan Nation and they're going to get me. I need to be in safe custody. And he starts laughing and somebody behind him starts laughing a little bit and he says he doesn't have time for snitches and rats and get the fuck out of my office. And then that's what I did. That's what he said, that he doesn't have time for snitches and rats. Get out, again."

[R. 37-1 at p. 18]. It is clear at the very least that, at that moment, prison officials were on notice of a specific threat to Malone's safety.

Missing from Malone's request for protection, however, was the element of immediacy. Had Malone testified that he had told the Lieutenant that Malone had been warned the attack would occur that night and prison officials still failed to act, it very likely would have taken his case out of the discretionary-function exception. While Malone's conduct in taking the risk to pass a note to the Lieutenant that he was in danger conveyed that Malone himself recognized the immediacy of the risk, there is no evidence that he conveyed that immediacy to prison staff.

Jimmy Malone, at great risk to himself, testified against dangerous individuals, knowing that doing so would endanger his own life. Unfortunately for Malone, the law is clear that, in this case, the United States enjoys immunity pursuant to the discretionary function exception, and for that reason it should be awarded summary judgment on all claims.

V. Conclusion

For the above reasons, it is RECOMMENDED that the Defendant's motion for judgment on the pleadings or, in the alternative, for summary judgment be GRANTED.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Bituminous Cas. Corp. v. Combs Contracting Inc.*, 236 F. Supp. 2d 737, 749–50 (E.D. Ky. 2002). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections within fourteen (14) days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).

Signed June 28, 2021.

Signed By:
*Edward B. Atkins*  *EBA*
United States Magistrate Judge